*23 There were a number of other cases in which similar statements of facts were drawn up for the court’s opinion thereon at this term.

The Court

decided, that the payments made into the treasury were not valid, and gave judgment for the whole of the plaintiff’s claim, except the interest during the war; that is, from the 4th of July, 1776, to the 3d of September, 1783.
The defendants appealed to the court of appeals.
*24 The law of nature is the only immutable law. It is implanted in the heart, and ought to govern the actions of all mankind. It is equally obligatory on states as upon private individuals; and a nation in its political capacity, as well as a private individual, can do nothing legally that is contrary to the law of nature. Ruth. b. 2. p. 6. s. 10, 11. Vattel, Prel. Discourse, s. 8, 9.
A person born in a state of society and government,contracts an obligation for the preservation of that government, in his earliest infancy, and before he is capable of making any other engagement whatever. Every person, therefore, knows, who enters into a contract with the subject of a foreign state, that the private engagements of the person who contracts with him, must yield to the prior and superior obligations he owes to the state, whenever its safety or preservation may require it.
Self-preservation is the first law of nature. If I contract with a citizen of France, I know that he is under a prior obligation to his country that prohibits his making any engagement that shall endanger its safety. I know that upon a war being entered into between this country and France, if their • safety required it, they might confiscate my debt, and apply the money to their own defence.
But though such contracts may .be made- to yield to the *25 safety of the state, consistent with the law of nature, which declares self-preservation to be its first rule in the ease of a state as well as of an individual, in a case of extreme necessity, yet Vattel says, it is not now practised. In Europe, and any state who should do it, will be guilty of a breach of the law of nations, as now practised, as upon the faith of that custom many of these contracts are created. Vat. b. 3. c. 5. s. 77. Grotius, 700. Jenk. 201. 2 Bynk. 177. But if I contract with one of our own citizens, bound by the samé obligations and the same laws, if he chooses to separate from this government hereafter, how can he acquire a right, or give it to others, to dissolve or annul this contract without my consent.
If two persons in a state of nature should enter into engagements with each other, before they had contracted any prior engagements with society, such private contract would be so far an alienation of their natural rights, that neither of them, without the consent of the other, could dissolve that contract, or by entering into, and becoming a member of, a society afterwards tobe formed, or then existing, could give that society a subsequent right to do it, 1 Ruth. c. 12. s. 9. 2 Ruth. c. 7. s. 12. c. 2. s. 4. Vat. Prel. s. 11. 1 Hale's P. C. 68. 1 Bl. Rep. 3. Ratcliff's Case.
How contrary to every idea of justice would it be to suppose that any man in a state of nature, indebted to another, might, by a quarrel between them, extinguish the claim of his adversary.
Such principles would tend to perpetual enmity and war among mankind •, and if an individual "could not do this himself, he could not, by any subsequent engagement with society, transfer such a right to others.
Upon the same principle, if one state is indebted to another, (and all states are in a state of nature with respect to each other,) no quarrel or war between them will extinguish the debt. So if two states join and form an empire, or if one subdivide and form two, the debts *26 contracted prior to such events, remain and must be satisfied. Puff. b. 8. c. 12. s. 2.
Here, then, was an obligation contracted, riot between subjects of different independent states, subject to the control, arid the prior obligations to the respective states of which they were citizens, but between two members of the same state, equally bound at the time by one common law. Could either of these, joining with others,. form a new government, and vest such powers in it as to extinguish this prior obligation, which was contracted before the government itself existed ? Government itself may be dissolved, either by breaking the public compact by general consent, or by the power of a conqueror. The obligations to, the state in these cases cease 5 but yet the contracts of private individuals remain. Ruth. b. 2. c. 10. s. 13. Ruth. b. 2. c. 6. s. 10, 11. 13. Ruth. b. 1. c. 13. 29. Vattel, b. 2. c. 14. s. 216.
When Great Britain, by her conduct, justified the resistance of America^ and the declaration of independence, all obligations to that government ceased. But our private obligations remained, and we were precisely in that predicament of a man who should contract a debt in a state of nature, and afterwards enter into civil society. We had already alienated so much of our natural liberty by the debts we had contracted, and could form no other contract, without the consent of the creditor, to defeat that obligation.
There is a wide difference between power and right. The state of Maryland might refuse the sanction of. her laws for the recovery of such a debt j but if it was necessary on this occasion, Í should contend, on the principles I have suggested, the state could not extinguish it, as being contrary to the laws of nature. Ruth. b. 2. c. 5. s. 3. c. 9. s. 6.
But in this case there can be no occasion to resort to that question ; because, when the creditor comes here to Seek his remedy, he submits to the laws of the state s if *27 they prohibit his recovery he must fail; if they do not, he must have judgment in his favour.
The laws of the state are the terms adjusted in writing, on which we are to live with the state, and with each other. The law of nations and public treaties, are the terms on which all states are to live with one another. Furg. Essays, 440, 441.
When there is no treaty, the law of nations, as now established, must prevail between foreigners. But the law of nations is of little import when there is a treaty, for that must be the law between independent nations in all cases to which such treaty extends.
In the consideration of this subject I shall examine,
1. Whether, by the law of nations or the common law, this debt was confiscated or extinguished, independent of any positive law of the state ?
2. Whether it was confiscated or extinguished by any law of the state ?
3. If it was, what is the force and operation of the treaty between Great Britain and this country, of the 3d September, 1783 ?
I admit that while a war exists between two nations, all intercourse between their subjects ought to cease, and that it is alone a suspension of the remedy, and may be pleaded in bar to the recovery of debts. Vat. b. 3. c. 5. s. 77. Grot. 700. 2 Bynk. 177. Park, 267.
But it is only a temporary bar that exists while the war continues. The debt remains in conscience, and peace restores the right of action. If there had been no law of this state respecting this subject, nobody could doubt for a moment but that, on peace taking place, the creditor might have brought suit, being restored to his right of action, and have recovered his debt. Dreadful would be the consequences if it were not so; for upon every war among the nations of Europe, the subjects of those states would be, at least one half of them, made bankrupts and ruined. Bynk. b. 1. c. 7.
*28 But the law of nations, as now established, is fixed upon more solid principles of justice and humanity. If the law of nations and the common law operate only as a temporary bar to the recovery during the continuance of the war, let us examine what operation the acts of this state can have on the question. (Act 1780, c. 5.)
That act is nothing more than a legislative compact between the state and its own citizens; the act gives them permission, but does not compel them, to lodge the money in the treasury, (for the use of the creditor,) with assurances that the money so lodged may be pleaded as a payment, or that they would not, by law, give a sanction to the recovery of other money in lieu of it. If this law or compact is repealed or broken, and private individuals have been injured by it, that is a subject which relates to the state and its own citizens that complain of the injury; but the foreign creditor is in no manner affected by it.
The state did not intend to confiscate the debt. If they had, they would have appropriated the money so paid to. the use of the state; whereas it is expressly declared to be lodged in the treasury for the use of the creditor, who may receive it whenever he thinks proper. But the sense of the legislature is clearly expressed by a subsequent law of the same session, when they confiscate all British property, debts only excepted. Act 1780, c. 45.
If they had supposed debts were confiscated by the first law, there was no occasion to have Said any thing respecting them in this ; and as the words are general, comprehending all British property, which would have included debts, it is plain by the exception, they meant to declare that debts were not intended to be confiscated. Puff. b. 8. c. 6. s. 20.
. But if the state of Maryland had expressly confiscated British debts, which I contend they have not, nor did not intend to do; yet still, I should now contend the treaty of peace would have done away the effect of such *29 an act, revived the claim, and entitled the creditors to recover.
It is no longer a question whether the congress had a power to make such a treaty. It is no longer a question whether the treaty, thus made, can bind the judges to decide upon it, in opposition to the then existing laws of the state. It is now declared to be the supreme law of the land, and is to be carried into effect, according to the spirit, true intent and meaning, thereof. Act of 1787.
The treaty was not intended to operate barely as a repeal of other laws, as it has been contended. If that was the intention, it would only have provided that all laws preventing the recovery of debts should be repealed, and the courts of justice open to suitors on both sides. But this is not the treaty which plainly means that these laws, and all proceedings under them, shall be no impediment to the recovery of debts in sterling money, according to the terms of the original contract.
Suppose the treaty to have recited the law of 1780, c. 5. to have recited the payments in the treasury under that law, and then to have declared that notwithstanding such payment the creditor might recover the debt in sterling money, will it be said this court could avoid carrying* such an express provision into execution?
There never was a treaty ending a war without mutual stipulations of benefit. At the time of the contest between Great Britain and America, Great Britain claimed the right of sovereignty over America. America thought she ought not to be subjected, and Great Britain ceded to this country its independence upon condition that they paid the debts due to the British creditors. Puff. b. 8. c. 8. s. 3, c. 10. s. 7. Ruth. b. 2. c. 9. s. 6. Vat. b. 3. C. 2. s. 12.
Suppose any island in this bay, the property of a citi-. zen of this state, had been ceded by the treaty to the British government, would not the grant of the state, and *30 the right acquired under it, be superseded and lost to the proprietor ? There can be no doubt of it.
The government have a right on such occasions to sacrifice the property or the privileges of any part of its citizens for the benefit of the whole.
If this be law, let us examine whether the fair and necessary construction of this treaty is not as plain to that effect, as if such a clause had been expressly contained in it. Vat. b. 2. s. 264. 271. 300. 307. Co. Litt. 147. a.
There are two methods of construing treaties;
1st. According to the words.
2d. That it may operate to the reciprocal benefit of both parties, and to have an effect in furtherance of natural justice and equity.
The 4th article of the treaty has the following clause t “ The creditors on either side are to meet with no legal impediment to the recovery of the full value, in sterling, of all bona fide debts heretofore contracted.” W ords as expressive as language will permit, and which comprehend as well their debts that have been deposited in the treasury, as those which have not been attempted to be paid at all.
A law that is universally beneficial cannot contain exceptions ; for such would make it only' beneficial in the cases not excepted. The word all, without any exception annexed to it, is a term of universality, and cannot be restrained, there being no ambiguity in the expressions.
To say that this clause was intended to restrain the enacting offuture laws, would be to make it absurd and of no effect, a mere dead letter; for any act passed after the treaty is guarded by the 6th article, and would be null and void. To put such a construction on this article as to consider it a guard against illegal acts, would be absurd, and. all constructions that introduce absurdity are to be avoided. They have said there shall be no legal impediment, which could only mean the impediments *31 that existed before the treaty was made should be done away. See Vattel, b. 2. s. 264.
The words are general. If any restrictions were intended, the exceptions ought to have been inserted, or the words will prevail. If they mean what they have not expressed, it was a deception of which they cannot avail themselves.
Besides, justice and reciprocal remedies to the subjects of both nations require the construction I contend for. They made no laws in England for payments of this narture. All persons having claims may ' recover them % and it was certainly the intention to place the subjects of both countries on the same footing.
If private persons enter into contracts, they cannot avoid them, or render them nugatory by any implied reservation ; this would be opening a door to endless contention, and the honour and good faith of a nation is more to be considered in the execution of its contracts, than those between private individuals.
I have shown that neither the law of nations, nor the common law, were any impediment to the recovery of debts after peace.
I have shown that the state did not confiscate, but expressly excepted debts out of the act. If the act of 1780, c. 5. had not been passed, would the payment in the treasury have been good l Certainly not ; it would have been illegal, and the court would have paid no regard to it. But the act of 1780 made the payment an impediment to the recovery; therefore it was a legal impediment, and there was no other legal impediment. If the treaty was not intended to remove this impediment, created by this law, it could have relation to nothing, and is a mere dead letter.
If the law had not passed, all debts would have been recoverable after peace, if the treaty had said nothing about them. All debts not paid into the treasury under the law, would be recoverable if the law had continued, *32 and the treaty had been silent respecting them; then the treaty must, by necessary construction, be applied to avoid these payments, or it can apply tb nothing.
Suppose all the debts had been paid into the treasury, and neither party knew it at the time of making the treaty, would not the treaty apply to them ? As there is no other impediment, it must apply to that or nothing.
When property is actually seized, the right of property must be transferred by the pacification, or the party may seize the property again, whenever he is able and strong enough to do it. Puff. b. 8. c. 6. s. 20. The state confiscated, and seized some property. 5th article of the treaty. As to that, the treaty stipulates that congress shall recommend a restitution of confiscated property ; but as to debts it does not recommend; the provision is express, as these were not confiscated and seized, “ that there shall be no legal impediment to the recovery of all bona jide debts heretofore contracted, without any exception whatever." Vat. b. 4. c. 2. s. 21, 22. b. 2. s. 264. 273. Puff. b. 5. c.12. See also Mr. Jeffersoids correspondence with Mr. Hammond, page 30. 48.
How can it be said that it %vas not the intention of the treaty to provide for the payment of debts over which the state had exercised their power, when it appeared that as to debts, of all description, the treaty speaks positively ; but as to those subjects over which the state had exercised their power of confiscation, it only recoma mends a reversion of their laws, and restitution.
It is contended the person must be a creditor at thfe time the treaty was made to derive any benefit under the 4th article, and then it is alleged that by the deposit in the treasury, the debt was paid and extinguished; all relation between debtor and creditor ceased, and that a personal defat once extinguished, is gone for ever : This is quibbling, and reprehended by Vattcl and all other writers on treaties. What was the intent of the contracting parties ? Could the British commissioner, or any man in *33 England consider the payment, or deposit in the treasury of paper money, as the payment to the creditor? But the debts did exist, they were not confiscated, but only a right given to the debtor to plead this deposit in our own courts in bar to a recovery. There can be no payment unless it is received and accepted, and the act of assembly could not oblige the creditors to accept it; it could only give a power to plead the deposit in bar. The debt existed until it was bona Jide paid according to the original contract of the parties, unless it be in such instances where the creditors themselves, or by their agents, consented to receive paper, or any other thing in discharge; in such cases, an extinguishment by the act of the party for a moment, would be so for ever. But it is not so, where the suspension or extinguishment is by operation of law, and.not by the consent of the party. If an obligee marries an obligor it is an extinguishment; so if the obligee makes the obligor his executor. 1 Atk. 461. cites 1 Sal. 229. 3 Co. 135. But if administration be granted to the obligor, the remedy is suspended only, for on his death it revives at law against his executor or administrator. 1 Atk. 461. So if there be an outlawry, it suspends the remedy only; but if it be reversed, or there be a pardon, it removes the impediment. Gilb. C. P. 202. Co. Litt. 128. b.
In like manner, war suspends the remedy, but peacq restores an alien to his right of action; for though each, individual acquires a right as against the enemy himself, to retain the debt during the continuation of the war, yet the plea of alienage is only a temporary bar, and is not said to be more in any book of authority that can be •produced. There is no act of the party in this case that can operate against him; no consent to dissolve this contract, or to suspend it for a moment. Grot. 700.
The effect of this act, therefore, was only to take away the remedy by action, which continued until the treaty, the act of a superior power, did away all the effect of *34 the act, and revived the remedy. As this treaty is the7 supreme law, and made so by our own consent, we have thereby, by our own consent, revived the remedy.
An infant by a promise at full age, may give remedy for a debt which before existed in conscience only. Cowp. 289. So the promise of a bankrupt revives a debt extinguished by the certificate of the commissioners of bankruptcy. Cowp. 290. 544. Doug. A debt, the recovery of which is barred by limitation, may be revived by a bare acknowledgment only. 2 Burr. 1099. Congress having a right to make treaties, had of necessity a right to supersede the effects of any precedent laws of any state in the union. But we have confirmed this treaty by a law of our own, and declared it the supreme law, and that it shall be carried into effect according t© the spirit, true intent and meaning of it. This makes the question to be simply what is the intention and true construction of the treaty.
I contend, that as there was no impediment to the recovery of all debts, except the act of 1780, c. 5. that it was the intention of the contracting parties to remove that impediment, or the words can have no legal operation ; that debts not paid into the treasury might have been recovered without this clause; that no future law could legally be made, if this clause had not been inserted, to prevent a recovery.
That you. cannot suppose it was intended to guard against paper emissaries, and the payment of debts in paper, since it had ceased to be a tender long before the peace.
That it could not operate as a repeal of the law of 1780 only, because that would be doing nothing. No money could be paid under that law after the first day of June, 1781, and the effect of the law had taken place long before, and there was no occasion to repeal it, unless it was intended also todo away every thing which had been trans *35 acted under the law, and render the payment wholly void , _ „ ' and or no effect.
The government might sacrifice the benefits that individuals would have had, to obtain peace. This construetion is most agreeable to the general and extensive words of the treaty; to the reciprocal benefits intended by it to both parties, and most consonant to justice and equity, and the law of nature, which expressly declares, that all debts ought to be paid according to their full value at the time of the contract. Ruth. b. 1. c. 13. s. 29.
Such has been the construction of this treaty by our own legislature, upon another clause of it; which provides, “ that all persons who have any interest in confiscated lands, either by debts, marriage-settlements, or otherwise, shall meet with no lawful impediment in the prosecution of their just rights ;” and under this clause the state of Maryland has paid one debt of 1200/. sterling, after having confiscated and sold the estate that was mortgaged to secure it.
So in the treaties made between France, Spain and Holland with Great Britain, about the same period, there is no such provision, because there existed no such acts of those respective states, which made it necessary to render their effects, by such a clause, of no validity.
But to confine the construction of the treaty to debts not paid into the treasury, or to any future acts of this, or other states, is giving the words only one half of their operation, for they certainly comprehend all debts, and all the laws then existing, as well as any that should thereafter be made. In fact it is downright quibbling, and not unlike the construction put upon a treaty stated by Puff. b. 5. c. 12. between Fabius and Antiochus, in which the Romans stipulated to restore one half of the ships of Antiochus they had taken, and then sawed the whole of them in two, by which they rendered the treaty wholly useless, and which Puffendorf reprobates with great severity.
*36 In the cáse that was lately argued in the supreme federal court, The State of Georgia against Towel Brailsford and Hopton, the court were unanimous in declaring that as the state of Georgia had only sequestered, and not confiscated, the debt in question, there was no doubt that the property always remained in the creditor, and that independent of the treaty, peace restored the right of action for the recovery.
We have here the common law, the law of nations, and the treaty also, in our favour. The state of Maryland did not confiscate debts; but by the act of 1780, c. 45. which must be considered as part of the same system, expressly excepted them, and the determination ■of congress as to this point is directly in our fav'our. '
I shall only further remark, that if the debt is recoverable, interest, the suit being upon a bond, is as much a part of the debt by the contract of the parties as the principal, and must be recoverable also, 3 Burr. 1375.
Key, for the appellee.
The magnitude of this subject arises from the great degree of property at stake on the decision of the court, and the general expectancy of the people has given it a. degree of consequence and importance far beyond what any difficulty or intricacy in the case would of itself occasion.
By an act of the legislature (1780, c. 5.) of Maryland, after it becomes an independent state, the citizens of said state, debtors to British subjects, were permitted to discharge their debts under certain circumstances, by a payment of continental paper money to the treasurers of said state, and the receipt of the treasurers should be good and sufficient evidence of the payment of such debt, in the courts of law and equity.
By the 4th article of the treaty between America and Great Britain it is agreed, “ that creditors on either side *37 shall meet with no lawful impediment to the recovery of the full value in sterling money of all bona fide debts heretofore contracted.”
Act of May, 1787, c. 25. The state of Maryland by a law enacted that the said treaty should be the supreme law of the land, and should be so considered and adjudged in all courts of law, and all causes and questions cognisable in said courts ought and shall be determined according to the said treaty, and the tenor, true intent, and meaning thereof.
Many of the citizens of the state of Maryland availed themselves of the act of 1780, and paid their British debts into the treasury. The creditors, by virtue of the treaty, have commenced suits against such debtors, and they have pleaded their payments in the treasury under the act of 1780, in bar of the recovery of such debts, and the simple question is, “ whether under, and in virtue of the said treaty and act of 1787, the creditors can now recover their debts against such payments, made in pursuance of the act of 1780.”
Questions depending between nations must be determined by the laws of nations where there has been no treaty. But if a treaty exists, the true construction of that treaty must be the rule, and must govern between them.
1. However, I shall consider the situation of the creditor and debtor at the time of the contract, and the operation of the laws of nations upon their contract, arising from the establishment of the state of Maryland into an independent sovereignty, and the subsequent war.
2. The operation and extent of the act of 1780, c. 5. sec. 11. upon those debts.
3. The operation of the treaty of peace, the act of 1787, and the act of 1780, as being made pari materia, and from thence form a conclusion of clear construction that the British creditors are entitled to recover of the *38 original debtors the amount of their respective claims, notwithstanding the payment into the treasury of Maryland.
Upon the first point. It is obvious that the debt was contracted between citizens and subjects of the same go« vernment, bound by the same laws, under the same obligations. That by the secession of the colonies of North America from Great Britain, the debtor and creditor became citizens and subjects of different independent governments, and I hold, under such circumstances, that the debtor carried the obligation of the debt upon and with him when he became the member of a new independent government. 1 Ruth. c. 12. s. 9. Vattel, Prel. sec. 11.
If two persons in a state of nature enter into a contract, and afterwards become citizens of the same or different governments, the contract still exists between them, and is not defeated by their posterior act.
The same reason exists if two persons are citizens of the same state or government, and one becomes a citizen of another government, the anterior contract or obligation is not destroyed by this posterior conduct, and it follows necessarily, if the same government of which they were citizens divides itself into two or more independent sovereignties, the anterior contract rides over the subsequent act of the parties, and binds them though they become members of different sovereignties created out of that government of which both were citizens at the time of the contract. This may be familiarized by examples : if A. a citizen of Maryland, largely indebted to his fellow citizens, goes to France and there becomes a citizen, it does not annul or dissolve contracts antecedently entered into by him, but they follow and attach upon him.
The state of Virginia allows a citizen to expatriate himself by a particular law. This done, such person is in a state of nature with respect to all governments j free *39 to choose of which he will become a citizen, and becoming one, his debts and contracts antecedently created follow and attach upon him, and any other construction would be idle and absurd; it would be preposterous to suppose, that by permitting a person to expatriate himself, he was thereby to be exonerated from his private contracts and engagements.
If from reason and authorities it is clear that where two persons in a state of nature enter into a contract, and one or both of them becoming afterwards members of different sovereignties, the contract still follows and binds, there certainly is, and can exist, no sound distinction where two citizens of the same government enter into a contract, and afterwards become citizens of different ,-sovereignties, but the contract must equally follow and bind; and from this it necessarily results, that the Maryland debtor, by the erection of Maryland into an independent sovereignty, is bound by those debts and contracts entered into when Maryland was a part of the British empire, and before its secession.
But it is objected, that the subsequent war between America and Great Britain confiscated the debts due from an American to a British subject, though created when under the same common government, and being alien enemies by reason of the war, the debt is not recoverable.
To this I reply, that by the law of nature all property and debts of aliens became confiscated by -a declaration of war. In ancient times every thing belonging to an enemy was fair gain, and in the most polished nations of antiquity the life of an enemy as well as his property was in the captor. They were generally, when taken, sold as slaves. But war is sufficiently dreadful of itself, without recurrence to the barbarous ideas and usage of even the most refined,of the ancient nations. To the honour of humanity, the frequent intercourse of modern nations, and the reciprocal benefits of extended commerce, has *40 established a different law; and however, in cases of extreme necessity, nations may be justified by the law of nature, to preserve themselves by a confiscation of debts due to an enemy, yet only such necessity can justify it, and it is not the law of nations, as now practised, so to do. The invariable usage is otherwise, and the history of the present century does not afford an instance of confiscation of debts by a declaration of war. Millions would have been'beggared on such principles in the frequent wars between England, France, Spain aiid Holland., within this century; and debts in modern times, eveii between citizens of different governments, being contracted upon faith of the usage now established among nations, it would be a breach of that faith, and a violation of the law of nations, to consider a declaration of war, of itself, as a confiscation of debts.
A declaration of war does not pay debts between the parties; but upon principles of policy, nations may not suffer their citizens to pay debts to enemies during a war, because it carries funds and resources out of their country to enrich their enemies. It weakens themselves and empowers their adversaries. War at present, therefore, only suspends the remedy, and if a suit be brought to recover a debt during a war, alien enemy may be pleaded in abatement or bar of such recovery. But such bar is only a temporary one ; exists during the war only, et cessante ratione cessat et ipsa lex. The policy ceasing, the measure directed by it ceases also, and peace, which restores the remedy, entitles the party to recover his debt from the alien debtor. See Vattel, b. 3. c. 5. s. 77. Grot. 700. Bynk. 177. Parker’s Rep. 267.
If, therefore, the situation of the contracting parties, becoming subsequently members of a new independent sovereignty, does not destroy the debt or contract, but it. still continues to exist between them, and if a declaration of war, according to the law of nations as now practised, does not, of itself, confiscate the debts due to aliens, we *41 ■must recurto the act of 1780, permitting the payments from the debtors into the treasury, to see the operation and extent of that act, which leads me to the second point, to wit:
The operation and extent of the act of 1780, c. 5. s. 11. upon these debts. This act permitted the citizens of Maryland, debtors to British subjects, under certain circumstances, to pay the amount of their debts into the treasury, and the treasurer’s receipt should be evidence of such payment.
I shall observe upon this act, that the debts due to British subjects were not confiscated, and what evidences this clearly, besides the exposition of the law is, a future law of the same session, where, in the general confiscation law, debts are excepted. • This law did not even compel or direct debtors to pay their debts into the treasury, but was merely permissive, and upon such payment made, authorized the debtors to plead the same in bar to the claims. Had a general confiscation of debts been contemplated, they would have been ordered to be paid into the treasury; but this was not the case. This law, then, became an impediment only to the recovery of British debts, as it furnished the debtor with a plea of payment against the creditor, though in truth and fact, no payment between the creditor and debtor existed. From reasons of policy this law took place, and might be availed of by the debtor in the same manner as alien enemy at common law might have been pleaded by him, and being an impediment to the recovery of the debt by the creditor, it would have barred the recovery had not the treaty and act of 1787 taken place, as I mean to show in the consideration of the third point, to wit;
3d. Point. That the treaty of peace, and act of 1787 together, repeal the act of 1780, and all benefits derived under it, and leave the creditor to recover his deb.t from the original debtor. I have already observed, that the law of nations governs between nations where there fe *42 no treaty; but if a treaty exists, the true constructive of that treaty must determine a controversy.
Whether the congress of the United States of America could then legally make a treaty to contravene the positive laws of any individual state or not, can be no question in our courts. The act of 1787 declares the treaty to be the supreme law, and directs our judges t© be governed by it.
Vattel, b. 2. c. 17. s. 269. The first general rule in the construction of a treaty I take to be the words of the treaty itself, expressive of the sense of the contracting parties, and the words of the 4th article of the treaty are so clear and precise that it seems to require some ingenuity to misunderstand them. “ That creditors on either side shall meet with no lawful impediment,” &c. What then is the obvious intent of the contracting parties, but that all bona jide debts theretofore contracted should be fully paid ? Was it, or could it be conceived by the agent of the contracting powers, that a payment into the treasury of Maryland of depreciated paper was a full payment of the debts to the creditor ? Most certainly not; but if any doubt or obscurity arises upon the expressions in this article, or if common sense and common honesty can doubt the meaning of the contracting parties at the time, let us resort to the preamble o£ the treaty as a key to discover the meaning of them.
It wisely states, that reciprocal advantages and mutual conveniences form the only permanent foundation of peace between states, See. ; that this treaty should take, place on principles of liberal equity and reciprocity, and reprobates partial advantages as seeds of discord, &c.
Now let us examine the reciprocity and liberal equity contended for. A citizen of Maryland is to be protected in the payment to a British creditor of depreciated paper money into the treasury of Maryland,, in discharge of his debt, and the British debtor is to pay the American creditor in gold and silver, to the full amount of his *43 claim. For instance, an American debtor owes 1,000/. to a subject of Great Britain, and pays into the treasury of Maryland the balance of 50/. in discharge thereof, 'and being the creditor of a British subject to the amount of 1,000/., he sues for it under the treaty, and recovers it in gold and silver. Now, if this be the spirit of the treaty upon principles of reciprocity and liberal equity, and reprobating partial advantages, the whole college of Jesuits may tafee lessons of chicane and duplicity from its construction.
But it is objected, that the treaty mentioning debts, must mean debts then existing, and these debts being discharged by a payment into the treasury, are no longer debts, and, consequently, the treaty cannot operate on them.
This is begging the question — the petitio principn of the logicians; for though the act of 1780 might per» Bait the payment into the treasury to be pleaded in bar of those debts as an agreement between the state and the debtors, yet the creditor was no party to this law, and without his assent was to be injured by its operation; and what was the treaty for, but made by the heads of the respective contracting parties, with a view to the benefit of the individuals of each nation. The contract is, that the creditor on each side shall meet with no law» ful impediment to the recovery of their debts. Then, as between the British creditor and American debtor, no payment has ever taken place, and if no payment, consequently the debt still exists and the creditors are entitled to recover, and this recovery between the creditor and debtor is guarantied by the 4th article of the treaty.
A declaration of war, as at present practised, suspends the remedy for the recovery of the debt; but war ceasing, the remedy revives with peace, and the debt is then recoverable. The state of Maryland, by the act of 1780, permitted the debtor to pay his debt into the trea~ *44 sury, and plead or give in evidence such payment in bar to recovery. This law, then, became an impediment to the creditor in the recovery of his debt, and peace, which in ordinary cases restores the remedy, would not have restored it in the face of the law, therefore it became necessary for a precise stipulation, and it was contracted in the 4th article of the treaty, that there should be no lawful impediment to the recovery. Now on a peace taking place, there being no impediment but this law to prevent the recovery of the debt, the treaty was intended and must be construed to operate on this very law of 1780, and though the treaty would not of itself annul the law, yet being declared the supreme law of the land in 1787, it does repeal and annul the provisions of the act of 1780.
Vattel, in his chapter on the construction of treaties, says, that “ where one construction leads to obscurity, and another to clearness and certainty, there can be little difficulty in determining which to choose.”
Now those debts are within the meaning of the treaty, or you construe it to be a dead letter. The treaty does not extend to illegal acts, but, no doubt, extends to laws (which are legal acts) of the state before the treaty. These debts were contracted before the treaty, and the only impediment to the recovery is the law passed in 1780, and, consequently, that law was contemplated by the contracting parties, and comes within the words and meaning of the treaty, and in truth, fact, honour and justice, there being no payment by the debtor to the creditor, the debt as between them still existed, and being an existing debt between them at the time of the treaty, and the treaty operating to protect the rights of the individuals of each nation, the ’ debt is recoverable by virtue thereof and the law of 1787. The words of the 4th article are universal and comprehensive. But it is objected that the act of 1780 gave the debtor a right to pay his debt into the treasury, and upon pay *45 ment, this right vested in him, and being once vested, could not be devested ; once a payment, always a payment, and the repeal of the act could not defeat rights accrued under it.
It may be answered: the payment into the treasury of Maryland was a legislative compact between the state and its citizens. The foreign creditor was no party, and, as I have observed, the act gave the debtor a right tb plead the payment in bar. Now as the legislature of Maryland had a right to confer a benefit on the debtor, its power was equal in depriving him of it afterwards, as exigencies required.
Had the creditor brought suit during the existence of the law, the plea of payment in the treasury would have been a bar, and yet common sense must admit it to be no payment to the creditor; but no suit being brought until the plea given by the act of 1780 was destroyed by the treaty and subsequent act of 1787, it is no longer efficacious. There never was a treaty without stipulating natural concessions for mutual benefit, and it was found necessary, in attaining this end, that creditors on each side should be protected in the recovery of their just debts, and this is declared to be upon principles of liberal equity and reciprocity. What necessarily follows That to obtain the great end of peace, as beneficial to the whole states, the rights of particular individuals should be sacrificed for the general good; and the payments into the treasury being a measure of policy, and not a payment to the creditor, such payments were sacrificed to the general public welfare, and a stipulation was entered into that the creditqrs on each side should meet with no lawful impediment to the recovery of their debts, and, consequently, the creditors are entitled to recover.
The stipulations of the 4th article are absolutely void and nugatory upon any other construction than what I contend for. Supposing the act of 1780 never to have ta~ *46 ken place, upon the establishment of peace the creditor could sue for and recover his debts. Then why introduce this article but to defeat the legal impediment to the recovery of these debts, created by the positive law of 1780? It is objected that it was to guard against future emissions of paper money; but this could not be the object of the contracting parties. Paper, by law, was no tender, and had then ceased even to be a circulating medium. It was felo de se; the immensity of state and continental emissions of money had made it its own executioner; and at this time the revival of a paper emission under which all had suffered, was never contemplated. The spirit and letter of the treaty meant to operate on a very different subject; to restitute the injured creditor the recovery of an honest debt, suspended by the war and the provisions of the act of 1780.
As the subject will be exhausted by gentlemen who, as counsel, have had the cause under consideration years before I was engaged in it, but who have aided me with their notes; to their arguments I shall refer, observing only, that this case must ultimately rest on the true liberal construction of the treaty, upon such principles as will, in its own language, best ensure a permanent peace, by making liberal equity and mutual reciprocity (free from partial advantage) the basis of it; and only suggesting to your honours, that the empire of America, now risen to importance amongst the nations of the earth, should establish its honour by a religious adherence to the extent of its engagements, free from cavil and exempt from chicane.
fellings, for the appellee.
Before and at the time of the happening of the disputes which have produced a separation between Great Britain and America, many of the subjects and inhabitants of the state of Maryland were indebted in considerable sums of money to several British subjects then and still resident in Great Britain*
*47 Soon after the different states had assumed to them» selves the powers of legislation, independently of the government of Great Britain, the state of Maryland, amongst the rest, made an ordinance or act of assembly, whereby the representatives of the state in congress were empowered to enter into a federal union. This union was in a short time effected, and was afterwards confirmed by a law of the separate legislature of each state.
By the terms of the confederation the sole power of making war and peace was lodged in the congress, as in the body which represented all the states.
Previously to the year 1780, both the congress and the different states of America had issued great quantities of paper money, which were then in a state of extreme depreciation. In this situation of things, the state of Maryland thought it expedient to pass a law to empower debtors within that state, to pay into the treasury there, in discharge of their several debts, the amount thereof in paper currency, according to, and estimating such bill in ©ach payment, at the sum for which it was drawn, though at that time, a bill for forty dollars was worth only one dollar in specie. For this purpose the act of assembly, 1780, c. 5. was passed.
In pursuance of this act of assembly, several of the inhabitants of Maryland who had contracted debts with British subjects resident in Britain, paid into the hands of the treasurer of the state, within the time limited by the act, the amount of their several debts, either in the old bills of credit, when one dollar in specie was worth only forty in paper currency, or in new bills, at the rate of one for forty of the old bills.
On the 3d of September, 1783, the definitive treaty of peace between Great Britain and America was concluded, and by article 4th of that treaty,it is agreed, that creditors on either side shall meet with no lawful impediment to the recovery of the full value, in sterling money, of all bona fide debts, heretofore, contracted.”
*48 la April, 1787, the following act of assembly was passed:
“ An act declaring the treaty of peace between the United States and his Britannic Majesty, the supreme law within this state.
“ Be it enacted by the general assembly of Maryland\ and it is hereby declared, that the treaty of peace made between the United States of America and his Britannic Majesty, is the . supreme law within this state, and shall be so considered and adjudged, in all courts of law and equity; and all causes and questions cognisable by the said courts respectively, ought and shall be determined according tó the said treaty, and the true intent and meaning thereof.”
Since the treaty of peace, some of the British creditors have, for the recovery of their debts, commenced actions which are now depending against their debtors, residents in Maryland, who, by way of defence, insist, that having complied with the. terms prescribed to them by the act of assembly, passed in 1780, they are legally discharged from the payment of these debts.
The true construction of the treaty includes these debts, and it was intended they should be recovered.
This is the first question which has been agitated in this state under the treaty, and being now to be determined by our own tribunals, we should decide it on the most liberal principles. We have just become a nation, and it is with nations as it is with individuals j their first conduct generally stamps their character for integrity,
The preamble plainly shows the principles on which the treaty should be construed.
Questions between nations must be decided by the law of nations, where there are no treaties. But where a treaty exists, that must be the rule. There being a treaty in this case, the law of nations is of little import, unless the expressions of the treaty are ambiguous, and then the *49 law of nations may be called in aid as a rule of construction.
It is still more useless to run back into the conduct of barbarous or ancient nations. In former times, whatever was taken by enemies, whether persons or property, belonged to the captors. They acquired the power of life and death, of slavery and manumission. Their conduct after a victorious war was more or less savage and cruel, as they were more or less civilized. The Romans dragged conquered princes at their chariot wheels, when the generals were decreed a triumph. But if the English had treated marshal Tollard in this manner when he was brought a prisoner to London, in the reign of Queen Anne, ancient practice would not have justified such barbarity.
To wander into remote antiquity on these subjects, however amusing, cannot enforce conviction respecting the present question. To pursue the argument in this manner is as absurd as quoting the ancient Romish canons respecting the annulling of Shandy’s baptism, which occasioned Toby to remark, u but what has all this to do With the child of a protestant gentleman, christened Tristram, against the will of his friends and relations ?” So here, what has the conduct of the Medes, Persians, or Macedonians, or the period of uncivilized customs in England, to do with the present law of nations, or the construction of a treaty entered into for settling peace on reciprocal and liberal terms, between America and Great Britain, who entered into and agreed to be bound by this treaty to terminate their differences.
War is sufficiently terrible as at present carried ona and there needs no superadded calamity, under the sanction of ancient cruelty, to render it more terrible. Instead, therefore, of wandering into the wilds of antiquity, we must have recourse to the treaty, which is plain and explicit.
The first rule of construction is to resort to the words, they being used by the parties to express their meanings *50 if these are plain, we should be guided by them. The words are plain : (Art. 4.) “ It is agreed that the creditors on either side shall meet with no lawful impediment to the recovery of the full value in sterling money of all bona fide debts heretofore contractedwords as plain as language can make them. Where such general terms are used, if any restrictions were intended by one party to operate as exceptions, such restrictions ought to be mentioned, and ought not to be supposed. See Vattel on the interpretation of treaties, b. 2. c. 17. If there were, thérefore, local laws existing, and within the knowledge of one of the parties, which were meant to operate as exceptions, they should have been mentioned'. Should a different construction prevail, the party, would take advantage of his own wrong; for if the words are so general as to include a case he means to exclude, he should be bound by the general words, or he would be benefited by his own deception.
If persons entering into contracts could avoid complying with the express terms of them under pretence of an implied reservation as to particular acts, it would open a door for endless altercation, instead of terminating differences, which ought to be the natural effects of agreements. A fortiori, Ought such subterfuges to be allowed in this case where the parties have expressly stipulated to treat on the most liberal terms.
Neither side could mean to stipulate against illegal acts of individuals, such as unwarrantable combinations of debtors therefore such proceedings could not be considered as infractions of the treaty, though we may presume the respective governments, in support of their own authority, would punish the aggressors. But any impediment that creditors should meet with, under colour of- a law of the state, would be an infraction of the treaty, ánd was expressly guarded against; to construe it otherwise, this treaty does nothing.
It is plain the treaty does not extend, upon any known *51 yule of construction, to the illegal acts, and if it does not either extend to acts imposed by law, it does nothing; for all impediments to the recovery of these debts must be unlawful impediments, or impediments imposed by law. It cannot extend to unlawful ones, and they say it does not to others; therefore it does nothing.
Is not this a bona fide debt ? Was it not contracted be- * fore the treaty ? Is not the impediment opposed to its recovery created by a law of the state l These facts cannot be denied, and it follows that the case is included within the express words of the treaty.
To suppose it does not extend to any impediments then existing, but was meant to prevent others in future, would be derogatory to the honour of the United States, as well as contrary to the words of the treaty. It would be derogatory to their honour, for it would be supposing they had a design to act with duplicity; that is, notwithstanding in the outset, they profess to treat on terms of liberal equity and reciprocity, and to exclude partial advantages, and use words fully expressive of this intent; yet that they would have passed laws, after the treaty, to destroy or diminish debts due to British merchants, had they not been prevented by a subsequent clause in the treaty.
The words of the treaty are general; but to give it this partial construction would destroy this general effect plainly expressed. Had they meant no future laws should be made, and nothing more, they would have expressed it, and not have used such general and inapposite language to express such a meaning.
If the letter of the 4th article was less explicit than it is, the preamble would explain the meaning. There are to be no partial advantages, and there is to be liberal equity and reciprocity. Now there were no laws in England made during the war, or at any other time, to affect American debts. But if the British debts are to be *52 destroyed notwithstanding the treaty, the reciprocity s* candidly professed is plainly violated. Suppose all Bri~ debts had been paid into the respective state treasuries in paper money, (the contrary of which neither of the contracting parties could know,) then, on the principles of construction contended for on the other side, the treaty might have had the effect to compel British debt» ors to pay all claims to American creditors, and to leave the B. :iisft creditors with a payment of one for forty. A construction which might have an effect so unjust, can certainly never be right, cannot be liberal or reciprocal ; yet such it ought to be.
Saying that creditors should meet with no lawful impediments, certainly means that no such impediments should be of any effect. A law that might have been a lawful impediment to the recovery of antecedent debts, is by the treaty prevented from having such consequence. The payment into the treasury under the law was, or was not a lawful impediment antecedent to the treaty ; if it never was a lawful impediment, then it can ■have no effect. If it was ever a lawful impediment, then, by the express words of the treaty, it is removed. The .act of April session, 1787, strengthens these observations. This law must be construed as if the words of the treaty were repeated in it; if so, it certainly includes all impediments.
2. The treaty should ba construed to have some effect, with respect to debts, or it would not have mentioned them; and construing the treaty to have a future effect only, is unjust and absurd.
To construe the treaty to mean only that no future laws should be made as impediments to the recovery of British debts, is making it of no effect, unless we suppose that the states would have acted unjustly in making such laws.
By the law of nations as now established, debts are recoverable after a peace; therefore at least all debts *53 not affected by any local laws of the particular states* were recoverable without the aid of a treaty, and to give it this effect only, is saying no more than would have been said without it. It might as well be said that .the treaty intended that no laws should be made to prevent British creditors from recovering their debts which might be contracted after the treaty, as to suppose any laws would be made after the treaty of peace, to prevent former debts being recovered according to the law of nations. But both being equally unjust, it could not be imagined that either would be attempted.
There was no occasion for a treaty to guard against the mischiefs, as there was a sufficient provision against both by the laws of nations. The treaty, therefore, was properly applicable to debts which would otherwise be affected by the local laws of the states, and any other construction would be nugatory. To have made future laws to prevent the payment of British debts after the treaty was made, would have been contrary to the law of nations, therefore unlawful; consequently, if such were the only laws intended to be guarded against, the language would have been more proper, had, it said, ^ the creditors shall meet with no unlawful impediments So the recovery of their debts.”
If debts are absolutely forfeited by a war, the act of 1780, enabling debtors to make payments into the treasury, was needless, for the debtors were already discharged from payment, and this act, instead of being a benefit to them, was an injüry, as it compelled them to make some payment, trifling as it was, and which, without this act, they need not have made.
On the same principles, all other British debtors are discharged who have made no payments into the treasury. For example, the position on the other side is this : A war extinguishes all debts due from the subjects of one belligerent power to those of another, the conclusion follows, that all debts due from the citizens *54 of America to British subjects were extinguished ; then what occasion was there for the act of 1780 to destroy' that which had ceased to exist ? If the position is right, no British creditor can recover any debt contracted be» fore the peace. By the' confiscation law debts are excepted ; this shows the legislature had no idea that they were forfeited by the war.
It'may be said that the above reasoning will apply to Great Britain as well as to America, and that as they had no law to prevent the payment of debts after a peace, it was thought they would have made them, or the preamble is of no effect as to them. But to this it may be observed, that the British know that laws had been made in America to affect debts, therefore they would think they had a right to make laws to affect them after a peace, unless both countries were put on equal terms.
3. The treaty should be construed so as to avoid absurdity and injustice.
Suppose mutual debts subsisting between American and British subjects, the first indebted for goods sold him, and the latter for tobacco sold or consigned. The American pays paper into the treasury under the act of 1780, in discharge of his debt to the British subject, and insists on a full payment of the debt due to him j this certainly would be the height of injustice.
When two nations contract, they have in view the mutual obligations resulting from the law of nations ; but if this is to be superseded by the local laws of one nation, the other must act in the dark, as they are not within its knowledge. Vattel, 177. The law of nations was introduced to avoid the force of local laws, for if local laws were to prevail in opposition to it, then there would be no decision, as the law of each country would be equally binding.
It is a principle of the law of nations, that every thing, without which the matter agreed on cannot take place, is tacitly granted. By the treaty, creditors are to meet *55 With no lawful impediment to the recovery of all debts before contracted; but there will be impediments to some recovery, if the act of 1780 is to remain in force as to these debts; therefore, under the rule, this act is tacitly as well as expressly done away by the treaty. Vattel, 207.
Objections. First, It is objected, the courts are bound by oath to determine according to the laws of the state; therefore, if the act of 1780 is contrary to the treaty, the judges are bound to determine according to the act.
Answer. Since the act of April session, 1787, this point seems to be immaterial, as the treaty is declared to be the supreme law within the state, and, therefore, the judges are obliged now, by oath, to determine according to the treaty, and the act of 1780 must give way to it. But if the act of 1787 had not been made, it would seem that the judges would have been bound to determine according to the treaty, notwithstanding the act of 1780.
By the articles of confederation, a power of making peace and war is vested in the congress, and, therefore, what they agree on in this respect, cannot be controlled by any particular state. Laws made having such eifect would be void, being contrary to the terms on which the union was founded.
If congress have a power to make peace, they must have a power of enforcing its stipulations ; if not, it is giving them a power to make a contract (for a treaty of peace is nothing more) which, when made, shall bind nobody. Maryland cannot claim an exemption, for if it does not bind each federal state, whom does it bind ? Certainly none of the United States; for all must be bound or none. And if not binding on America, it is not on Great Britain, for the obligation must be mutual, and if one power is not bound, there can be no obligation on the other. On this reasoning the treaty would be void.
The treaty was made by the supreme power in the *56 United States, and with the concurrence of every particular state by a separate law of each state, vesting a power for that purpose in congress ; therefore it is the same thing as if each particular state had been a party to the treaty, or had ratified it by the most solemn legislative acts. This antecedent power, vested in congress by the states, is equally strong, if not stronger, than if they had ratified the treaty by express acts. Omnis raiihabitio mandates eequiparalur.
The scparaté states could not, in this case, act without a head. They have chosen a head for this purpose; consequently each state must be bound by the acts of that head. When a treaty is made which contravenes the law of a particular state, either the treaty must supersede the law, or the law the treaty. But if the particular law supersedes the treaty, then no treaty can be made by congress, since no treaty can bind. Suppose such particular local laws were to occasion a breach with a foreign power, and the state who made and insisted on these laws was to be invaded by a foreign power, upon what ground could such state expect congress to declare war, if it denies its power to make peace. If congress in this case was obliged to declare war, it would be putting it in the power of any particular state eventually to declare war or peace. What treaty of peace was ever made merely declaring war to be at an end, without containing stipulations of some benefit to each contracting power.
If no treaty can rescind the effects of an act of assembly of a particular state, then any state may dissolve the powers of congress as to making treaties. This would make us cease to be a nation; for no particular state is the nation, but the whole united together. This would also throw the power of making treaties into a particular state; for instance, the treaty will not be effectual unless particular states will consent to what will make it so. What cannot be done without the counsel of another, is *57 •entirely under his control. Perhaps it would not be px-acticable for congress to make peace without entering into stipulations contrary to the laws of some particular state, which must be exceedingly various. Those who treat would be obliged to know all the particular laws of every state, before they can tell what expressions in the treaty may affect them, and in that case all the states must be consulted.
Vattel says, if the sovereign has the right of treating and contracting with other states, he must have the necessary power to make a valid contract. This cannot be ■shaken by any fundamental law, otherwise it would be ■to forbid all contracts with other nations, or to deceive •them. A nation with such a law ought never to treat of its property. If it is obliged, it must renounce its fundamental law.
Public treaties can only be executed by sovereigns wh© contract in the name of the state. That a treaty for the recovery of debts in this case might be made, must be admitted. It is not opposed by any thing in the confederation ; but no individual state could do it, not having the right of sovereignty. If the congress had no such power, it follows that no such treaty could be made.
Let us reverse the argument. Suppose acts of assembly of particular states were made during a peace, allowing the subjects of Great Britain, or those of any other nation, particular privileges, as to enter their ports and import any kind of goods duty free, or other acts of a similar nature. Suppose congress were to declare war against such nation, would it not rescind the benefits they might claim under such acts. But if no act of congress could affect the acts of assembly of particular states, these privileges would remain, notwithstanding a war. But surely a construction so destructive to the principles of the union, and the powers of congress to make war and peace, could never prevail. If acts of a particular state may be rescinded by congress for the benefit of the Uni' *58 ted States, on a declaration of war, certainly particular acts may also be rescinded for their benefit, on a treaty of peace. The good of the whole must be the governing principle in each case, or how is the line to be drawn l
By the treaty, art. 6. no person is to suffer by reason of the part he took in the war. Yet by our treason act, and those of other states, they were subject to capital punishment. By an act of assembly no remittances are to be made to Great Britain. Neither of these acts are repealed otherwise than by the treaty. But if the treaty cannot rescind the acts of any state, they are still in force.
May not this distinction be made respecting the powers of congress, that where a particular state makes laws which can only affect its own citizens, congress cannot alter them by any treaty with a foreign nation; but where the laws relate to transactions of foreigners with their own citizens, then congress may destroy, modify, or regulate them by treaty. So that if the declaratory act of 1787 had not been made, yet the treaty would be effectual to give a recovery for these debts, but that act puts it out of dispute.
Second Objection. The treaty operates as a repeal of the law of 1780, but it does not destroy acts done under it.
Answer. This admits the power of congress to rescind the laws of particular states on a treaty of peace, and, therefore, only brings it to a question of construction, whether the treaty, from the expressions and meaning of it, is to have one effect or the other. This, therefore, lets in the before-mentioned reasons, proving that the payments made under the act of 1780 were destroyed.
If the treaty is only to operate as a repeal, there was no occasion for the 4th article, respecting debts; for the 6th article was a sufficient provision against any future loss or damage. The 6th article will certainly operate *59 as a repeal of the treason act, so far as it affects the conduct of persons during the late war. Also of the act for preventing remittances to Great Britain, even if the nature of the treaty was not a sufficient repeal. It would, therefore, certainly operate as a repeal of the act of 1780, otherwise different constructions would be put on the same words. The 4th article, therefore, respecting debts, must receive a more extensive construction, or it is useless.
Third Objection. If the treaty gives British creditors a right to recover all debts before contracted, yet such recovery must be from the United States, or from the particular states where the debtors resided and the payments were made.
Answer. Had this been the intent it would have been certainly so mentioned, and words which naturally lead to a different construction would not have been used. The obvious meaning of the term recovery, is a recovery in a court of law, and had a different acceptation been intended, it certainly would have been mentioned. If the United States collectively were to pay these debts, there Would have been some mode pointed out from what fund they were to be paid. If each particular state was to pay its respective debts, then one might pay very considerably, and another nothing. This would be unequal. Is it to be supposed such points were to be left open to discussion, and that the creditors were to receive" nothing till they were settled ?
What compulsory means could the creditors of a foreign nation have against the public, in case of a refusal ? It seems they are entitled to a recovery; the means of compelling it should be therefore granted; but what means of compelling a payment could be used against the public ? Where one nation stipulates to pay a sum of money to another, is there any mode of recovery .but by a request, and, on refusal, to do itself justice by force ?
*60 Suppose a debt due to an American creditor by a British subject; must he resort to the British nation for payment? If not, there must be different constructions on the same words. If the public is to be resorted to, it must be by the debtors, and if they have any claim of equity from the whole circumstances of their case, relief may be afforded.
Was it ever known that where, on a treaty of peace, one nation agreed to pay another a certain sum, such words as these were used, “ that they should not meet with any lawful impediment in recovering it.” For this presupposes a probability of a refusal.
Suppose the British nation were to apply to congress or the states for payment, and on refusal make reprisals, should we not exclaim against such conduct, and say they ought, ‘ under the treaty, to have recourse to the debtors.
When an application to the public is meant, it is inserted as is done in the 5th article. If the public were obliged to pay these claims, they would have been ascertained. How are disputes between British creditors and the states to be settled ? Are their demands to be paid at all events ? If not, who are to settle the quantum of the debts justly due? Had such been the .idea there would have been some mode pointed out for the trial of disputed claims. This is easily done in the courts of judicature.
Fourth Objection. It will be a hardship for those who have paid into the treasury.
Answer. It will only be taking from British debtors a privilege they had beyond others, and reducing them to terms of equality. But if the effect were so, such are the terms of the treaty, and that alone is the guide.
The principle of the objection is, that if, during a war, particular benefits are given by law to a certain class of men, these benefits can never be destroyed by a treaty of peace, however the public interest may require it. The- *61 consequence might be, that the nation might be continually at war, and thus the whole be destroyed for the supposed benefit of part. "Whereas there is no truer rule in politics, than that the interest of part should give way to that of the whole.
The debtors by the law of 1780 had a privilege given them, which the states for the general good thought it proper to waive. The debtors, therefore, are not in a worse situation than if the law had not been made. But if they were, the good of the whole is the supreme law. Other persons who have received paper must submit to the loss j and the treaty only puts British debtors on the same footing with others who had none to pay.
Fifth Objection. That these debts were forfeited at common law, the creditors being enemies of the state, and that the defendant paid the state the sum of-/. with legal interest, on the 20th March, 1781, according to the condition, to the treasurer to whom the debts due to the state were payable, and obtained his receipt.
If they are forfeited at common law, the common law must give the rule. If there is such a rule, it is supposed to be grounded on one of two principles; either that when two nations are at war, the debts are immediately forfeited, or that the creditors are to be considered as alien enemies, and that debts due to them are forfeited.
The definition of an alien at common law is a man born out of the allegiance of the country. Unless he is so born, he cannot be an alien at common law; he may be made so by legislative acts, but the plea alleges no such acts, and therefore is a plea at common law and not under any statute.
The above being the common law distinction of an alien, so it follows, that what the common law means by an alien enemy, is a person bom under the allegiance of a country with whom his sovereign is at war. If, therefore, any effect of forfeiture could flow from the circum-? *62 stance of a person being an alien enemy, yet the facts necessary at common law to make him so, cannot be so supplied.
The defendant says he paid the debt to the state ; therefore it is a bar to them, and the state must be answerable. To this it is answered, their plea alleges a payment of so much sterling and current money, the amount of the debt; but the receipt proves no such thing, but a small part under the act of 1780 ; this is a variance. If a statute empowers a person to plead in a particular manner which he could not do at common law, it must be a plea under the statute. 1 Stra. 652. This is no payment at the common law.
An alien is a person born out of the allegiance of the country. There is no other definition of an alien at common law, and he must be so the moment of his birth; and if he was not an alien immediately when born, he could never afterwards become so, on any principle of the common law, though the legislature may have a power to declare him one. The common law could never include a case not the object of any of its provisions, nor in any manner supposable; such as, for example, the dismemberment of an empire. It would be absurd for one country to institute laws with a view to affect its subjects under these circumstances.
If it is said the common law is adopted here, yet that does not alter the case, because this is not according to any common law principle, which only applies to the time of the birth. This was so understood by the legislature when they passed the act declaring what persons should be aliens ; they neither thought they were aliens at common law, nor that their being declared so confiscated their debts. But to oppose this act, would only be opposing one act instead of another, even if it created confiscation.
But if they are to be considered as aliens at common law, and the debts are forfeited on that account, the *63 treaty leaves the creditor at large, and any such impediment is removed by the treaty.
It is said, that at common law, they being enemies, this debt was forfeited to the state, and that they paid it to the treasurer, who was empowered to receive it. They must prove, 1st. That it was absolutely forfeited at common law; 2d. That they paid it to the treasurer for the state ; 3d. That he was empowered to receive it for the state; 4th. It must also appear to the court, that the debt was so absolutely forfeited to the state, that a peace would entitle the creditor to sue for it; and further, that the treaty gives him no right.
Supposing the common law was ever applicable, yet at this time, debts are not so forfeited by a man’s becoming an enemy, but that he may sue for them after a peace, or receive payment, which will be a good discharge to the debtor against any claims from the state.
The plea of alien enemy can never be pleaded, unless the party is one at the time the action is commenced, for the disability arises from the incapacity of the person to sue ; which incapacity is grounded on the policy of not suffering money to be carried into an enemy’s country. But neither principle applies when the war is ended. Cessante causa, cessat effectus. Co. Litt. 129. 2 Inst. 58.
If a Frenchman comes into England with goods before war is proclaimed, neither his person nor his goods shall be seized; otherwise if he comes after. Jenk. 201. Hale says, that an enemy coming in after the war begins, without the king’s license or safe conduct, cannot claim the privilege allowed by magna charta (c. 30.) to those who were here before the beginning of the war. 1 Hale, 94, 95. The statute of magna charta is a license and safe conduct to aliens coming before the war ; but if their debts are to be placed in the same situation, though contracted whilst they had this safe conduct, as those enemies coming after a war, then the property of the one is more protected than that of the other. If. *64 their property is not, the same reason applies to their persons; it is therefore needless for Hale, or any author, to talk of distinctions between them.
Martin, (Attorney-General,) for the appellant.
By war, a nation acquires a right to seize upon, take possession of, and appropriate to its use, the property of the enemy, whether belonging to the public or the individuals ; and the right to seize upon, and appropriate the debts due to the enemy, is the same as the right to other property. Vattel, b. 3. c. 13. s. 193, 194, 195.
Each individual who seizes upon the property of an enemy, or gets it into his power, in time of war, as to the enemy himself, acquires a right in such property; how far he shall have a right as to the nation of which he is a subject, depends upon the laws and regulations made by that nation. Upon the same principle, the individual who owes money to an enemy, acquires the property in that money as far as relates to the creditor, it belonging to an enemy and being in the debtor’s possession and power. The common law of England recognises the same principle as the law of nations ; that by war, the property of an enemy’s goods is lost to him as soon as got into the possession of his enemy ; and that the right to, and interest in, a debtor is lost to the creditor, if such creditor is an alien enemy. Hence, in an action brought to recover a debt, the plea of alien enemy is not merely dilatory, but may be pleaded in bar.
I admit that among the European commercial nations, the strictness of the law of nations, particularly respecting debts, in some measure is relaxed, partly founded on stipulations in treaties, and partly on commercial principles; and that among them it is now by a kind of common consent established, that if the nation doth not by some act interfere after peace, the debts shall be paid : But the principle has never been controverted, even among the most commercial and polished nations, that the debts *65 of the enemy (except public funds and debts due from the public to the enemy) may be seized upon, confiscated and appropriated. In fact, that a nation has no absolute power over all debts due from their subjects to an enemy, and may exercise it when, and in what manner it pleases. In the exercise of this power, no subject of the enemy, however injured, receives injustice, or has a right to complain, except against that government of which he is a subject, and by whose conduct he is exposed to the injury; and it is only from his own government that he is entitled to claim compensation for his losses, if he has a claim for compensation anywhere. The state of Maryland, upon these principles, had a right to exercise its power over the debts due from its citizens to the British subjects. War gave to the state a right to those debts ; the state might have seized upon the whole, or any part of the debt of the British credit- or, as well as upon his other property. It might by its acts have cancelled them entirely in the hands of the debtor; it might have brought them all into the treasury ; or it might have freed the debtor from the debt, on paying a certain portion of it, or giving any equivalent for it; the state having the absolute right in, and power over, those debts, might modify the exercise of that right and power as it pleased.
This right and power the state did exercise in certain cases ; by its laws it authorized the debtor to bring in paper bills of credit into the treasury, to the amount of the British debt, for certain terms, and whenever the terms were complied with, declared it should be a payment and discharge of the debts to the British creditor. The state by this did no injustice ; the state exercised an undoubted right.
To the British creditor the state owes no compensation; it is for that government, the connection with *66 which caused his misfortunes, that the British creditor is only entitled to redress, as I have before stated.
The debtor did no injustice in accepting the terms of the law ; none to the British creditor, for the reasons before ; none to the public, unless accepting the benefit of a law passed in his favour was an act of injustice.
But the particular nature of the cases where the state: did exercise its right over the debts due to its enemy, was such that every candid mind must admit it was not only proper, but that it would have been cruel and unjust in the state had it not been done. It was necessary to prevent many worthy and well-deserving citizens from ruin, and from being ruined for their Observance of the laws ; and ruined only to benefit our enemies.
As far, then, as relates to debts paid into the treasury, according to law, the state has actually exercised its right over the debt which was due to the enemy; which right is conceded by ,all, and therefore it doth not depend on the question, whether debts may, by the law of nations as usied by certain nations, be recovered after peaces no positive acts having been done during the war to prevent it: The question will therefore be, whether, in consequence of the treaty, the British creditors can recover in those cases. The citizens who paid made their payments long before the treaty had existence ; they acted under the sanction and authority of a law of this state, founded in wisdom and justice to its own citizens, and free from injustice td any. They had acquired rights under the existing law of the state. They had discharged the debts’. The relation of debtor and Creditor had ceased between them and their former British creditors, as entirely and bona Jide, even according to the law of nations, as if the debt had never existed, or had been actually paid before the war.
Can, then, die treaty operate to destroy the acts which were done before its existence ; to take away the rights bf individuals acquired under otir lawsj and which vest *67 jci in them during the continuance of the laws ? Had congress such power ? I think, if necessary, it might be questioned. How is the treaty to operate for this purpose ? It is said, either in its own nature, or in consequence of the law of our state, declaring it to be the supreme law of the land, it operates as a repeal of the former act. Admit it to be so ¿ the repeal of a law cannot destroy acts done and rights acquired under the law during its existence, and before its repeal { and though it is declared to be the supreme law, still, as far as that declaration goes, it is but a law j nor doth that declaration cause it to be the supreme law, or any law, before it existed as a treaty. The repeal of a law prevents rights being afterwards acquired under the law repealed, but doth not annul those acquired preyiously. The contrary construction would be replete with iniquity and injustice.
Congress had no rightful power to infringe or annul any law of any state in the union, or to interfere with the right of any individual acquired under these laws. The most they could do rightfully, was to stipulate against acts being done by the states after the ratification of the treaty, nor would this be binding on the states in any other manner than as in ratifying the treaty they would accede to the terms j and if they refused they would be deprived of the benefit of the treaty, and would be guilty of a breach of the treaty, by doing in future the acts by the treaty prohibited. But every person might, at a moment’s view of the question, perceive an infinite difference between stipulating against future acts being done, (which acts being future, are in the power of the states not to do, and which stipulation still doth not restrain them, unless they think the peace ought, on those terms, to be accepted,) and destroying acts already done, and taking away rights of individuals already vested.
The British commissioners did not treat with ours as being the delegates of an absolute monarch ; they well feney our government, its nature and constitutipn. They *68 knew our commissioners were the representatives of the head of confederated republics, tied down and restrained in such a manner, that this head had no power or control over the laws of the several states, or over the rights acquired under those laws.
But it is said congress had a power to have given up by the treaty a particular part of our territory if it had been necessary ; that a government may, for the sake of peace, abandon cities, provinces, individuals and their rights. Whether this can be rightfully done by the head of a nation, so as to be binding on the nation, except where the head of the nation is an absolute and unlimited monarch; and whether congress, with its confined and limited powers, could do this is very doubtful. See on this subject, Vattel, b. 1. c. 21.
But even in that case it seems, I think, pretty well established, that in fact, no right is thereby given to the conqueror over those abandoned for the public good; they are only left to the power of the conqueror’; and those so abandoned, if they are strong enough themselves, or can procure assistance, have a right to defend themselves against the exercise over them of that power of the conqueror to which their own nation hath, from necessity abandoned them. Vattel, b. 1. c. 21. s. 264.
But the advocates for the British subjects wish to carry the doctrine much farther ; they insist that rights are conferred thereby to the conqueror, and that our courts of justice are to enforce those rights.
But in every case where the rights of individuals are sacrificed by a treaty, it is held that the state who thus sacrifices them is bound to compensate; nor can it be admitted except from absolute necessity, where being in the power of a conqueror who dictates the terms, peace can only be thereby procured. Was that the situation of the United States, and was the treaty made on those principles ? Admit this to be the case, and that Great *69 Britain, giving law in the treaty, we were compelled to .sacrifice the rights of individuals to obtain peace, let it be remembered that is a rule that, in case of doubt, the interpretation goes against him who gives law in the treaty. Vattel, b. 4. c. 3. s. 32.
That it was not the intention of the parties contracting to provide for the payment of suet debts, over which the state governments had exercised their right and power, so as to annul those acts, or to destroy the rights acquired, I think it must be clear. It is evident from the face of the treaty, that all parties considered power was wanting for that purpose, and, therefore, as to everything which had been done by the state, which was complained of on the part of Great Britain, the 5th article was excepted. And even the 6th article, providing against acts being done in future by the state governments, from the nature of the subject, and from the clear working of it, was not to have operation from the date of the treaty, even on its arrival in America, but only from the ratification of the treaty j since it expressly supposes persons to be deprived of their liberty till that time, and at that time under prosecution.
The very case now in question is clearly within the provision of the 5th article, which says, that congress shall earnestly recommend to the legislatures of the several states to provide for the restitution of all estates, rights and properties (which surely include debts) which have been confiscated. All those debts which had been discharged under the law by payments into the treasury, were as much confiscated as any other property. For though the state did not confiscate debts generally, yet as to ail those cases where, under the law, payments were made into the treasury, it was a complete confiscation, in the strictest sense of the word.
Let us examine the 4th article, on which the question rums.
The person who wishes to avail himself of that article, *70 must have been a creditor at the time when the treaty was made ; for the words are present, and not that those who were or have been creditors, &c.
The debts also, on which the treaty is to operate, must have been existing at the time of the treaty; for if you do not give it that construction, all the debts contracted theretofore, although paid long before the commencement of the war, by the treaty must be paid over. They must not only be subsisting debts, but they ape restricted to those which had been fairly and honestly contracted, and fairly and honestly due, and not set up or kept on foot fraudulently and improperly, for the words bonq fide are restrictive, and must have some such import. And so far from the words bona fide being of advantage to the construction of the treaty, advocated for the British subjects, I think it is the reverse; since, as far as it can have operation, it is certainly restrictive, the word debts being more comprehensive than bona fide debts, which confines it to a particular kind of debts. With this construction of the article let us compare the cases in question.
In the case of payment into the treasury, according to the act : from that moment, according to the law of nations, as well as the law of this state, the British subject to whom the debt had been once due, ceased to be the creditor of him who had thus paid the money. As I have before observed, the relation of creditor and debtor was as totally done away as if there had been no debt ever due; from that moment, as to the former credit- or and debtor,vthe debt was paid and discharged as absolutely, and no more subsisted between them, than if the debt had been paid before the war. And this payment was not only agreeable to our own law, but according to the most approved and liberal law of nations, as complete, as satisfactory, as honourable, and as bona fide as if it had been paid before the war to the British subject himself.
*71 The debt, therefore, which, according to the law of nations, was bona fide discharged and paid, could not possibly be a bona fide debt, actually subsisting for the treaty to operate on, either by the construction of the law of nations, or of Common sense. The cases now in controversy are clearly not within the Words of the treaty, since the claimants were not creditors at the time when the treaty was made 5 and since what is now claimed was not a bona fide debt at that time, nor was it a debt of any kind, either in equity, in conscience, of in honour, and those who argue differently, totally mistake the casé, since the state had antecedently fairly and honourably exercised over it the rights which the laws of nations gave and sanctioned to the state, and hot to have used. Which would, in these cases, have been the height of injustice and cruelty to many of her own citizens.
If not within the letter, it shall not be included by com* struction; because a construction shall not be given which would make the parties contract beyond the powers constitutionally given to them, and because a construction shall not be given to a treaty to make it disannul laws, take away rights, and injure individuals.
Besides, as before observed, the treaty interfering With, and taking away, rights vested in individuals, and abandoning them for the public good, can only be justified on the principle of state necessity, and being in the power of the opposite nation, who gives the law to the other; and in treaties so made, the construction, in all doubtful cases, is to be made against the party who gave the law in making the treaty»
It is also a principle that all things not mentioned and particularly provided for in a treaty, are to remain in the same state as they were at the instant of the treaty, and any change in that state, meant to be made, requires an express specification. And every thing in a treaty that introduces any change in the state of things, from what they had been before or at the time of the treaty, is considered as odious. Vattel, b. 4. c. 2. s. 21.
*72 Whatever rights have been acquired during war, • can only be left, as far as they are clearly given up: and, con» sequently, all such clauses, giving up rights, ought to be taken in the strictest sense. Vattel, b. 2. c. 17. s. 304, 305.
The cession of a right made to a conqueror to obtain peace, is interpreted in its most confined sense ; principles which apply directly against the construction given by the advocates of the British subjects, who wish to extend the construction of the treaty to debts which had been paid and cancelled by our laws, and by the law of nations; debts over which the state had exercised its power. Id. s. 308.
Objection. If our construction is right, it is said the article is nugatory, because, by the law of nations, all debts over which the state has not exercised its right during the war, after peace belong again to the former creditors, and may be recovered.
Admit the clause to have no other construction or use, yet it might not be proper.
This privilege to the original creditor is considered rather a relaxation of the former law of nations, partly introduced by stipulations in former treaties, and partly from commercial principles among commercial nations. It is rather a usage of certain nations than a law of nations generally, and it is not recognised by the general principles of the common law of England. The case cited from Parker's Reports is expressly stated to have turned generally on the treaty. America had but just taken her rank among nations. To prevent disputes it was more proper to insert an express clause, in a case which might not be thought clear, than to rest it upon what should be the sentiments afterwards of the contracting parties with regard to the law "of nations. Claims only declaratory are not unusual both in laws and trea - ties.
*73 Hut there is a clear, proper and pertinent construction So the clause, which it may have. A provision necessary and proper is thereby actually made independent of the claims now in question. It was notorious that there were large sums due from the citizens, not only of Maryland,» but also of the other states, to the British subects, over which the states had not exercised the rights of war.
It was also known that most of the states, if not all, had at that time paper money in circulation, and were in the habit of emitting paper. The probability was, (and that has been the case,) that after peace the paper money would still be a circulating currency of the state, and that it would not be of the value of sterling money ; that consequently after the peace, when British creditors sued, (-without a provision to the contrary,) they would be obliged to receive paper money in payment, and thereby be deprived of a part of the value of their debts j to prevent this, the 4th article was agreed to, and the words clearly point out what they feared, and what they meant to guard against; they feared the debts would be paid off at less than their real value, and in a paper currency ; they therefore stipulate that there shall be no legal impediment to the recovei-y of the full value, and in sterling money ; but this is tied up to the case of bona fide debts, thereby clearly excluding the idea now advocated, that it should extend to debts which were paid and cancelled by act previously done, and which, therefore, couldNnot on any principle be said bona fide existing. The payments having been made in depreciated paper, cannot alter the legality or the equity of the question. The state having an absolute power over the debt, did no injustice to the former British creditor by permitting paper to be paid and every person who under the law paid paper, had been obliged by law to receive paper. The state, therefore, acted fully and consientiously in supposing the debtor to pay to the treasu *74 r_y the same kind of money it had compelled him to re» ceive for sterling and specie debts.
As to the question of interest of such debts as the treaty operates on, I hold clearly that the original creditor, though now entitled' to the debt, yet he cannot recover interest during the war. Interest is the usufruct of money, and where, after peace, the property reverts to the original owner, the usufruct or products which became due, or were received during the war, are not to be accounted for according to the law of nations. Vattel, b. 4. c. 3. s. 30.
As to the objection that this is different from the usual case of war between two different nations, because we were formerly, and when the debts were contracted, subjects of the same kingdom, Vattel, b. 3. c. 13. s. 292, 293, 294 and 295. proves that there is no justice in the distinction.. That a civil war breaks the bonds of society and government, or at least suspends their force and effect, produces in the nation two independent parties, considering each other as enemies, and acknowledging no common judge. That these two parties are in the case of two nations at war. That the common laws of war are to be observed on both sides. That while subjects who take arms against their sovereign acknowledge his authority, the effects of war as to the acquisition of property do not take place; but when they cease to acknowledge the authority of the sovereign, and the nation is divided into two parts, absolutely independent, and acknowledging no common superior, the state is- dissolved, and the war betwixt the two parties in every respect is the same with that of a public war between two different nations.
The same principles which justify seizing and confis.cating the property of enemies, in a war between different nations, justify in the present case.
If government oppresses its subjects, or any part of them, and violates its compact towards them, these so oppressed have a right to resist; and if necessary have- *75 a right to resist by arms. If government will persist in the oppression, the citizens who are so oppressed have a right to withdraw themselves from their old government, declare themselves independent, and establish a government for themselves ; their former fellows have their option either to join them, or to remain subjects of, and connected with, their old government; if they join the new government, they enjoy all the benefits arising therefrom; if they elect to remain subjects to the old government, they must also expose themselves to the inconveniences arising therefrom; by so doing, they become parties to the injustice and oppression of that government they have elected to continue subjects to, and, as members of that government, become personally responsible for the conduct of that corporate body of which they constitute a part, and it is on this principle that the property of particular individuals of any nation, in time of war, may be seized and confiscated by the other nation with whom they are at war ; and it is as fixed a principle, and as well known, that if subjects of the same nation deal together, enter into contracts, and through the oppression of the government a civil war should take place, in consequence of which a certain portion of the subjects should become independent, and set up a new government, while any portion should adhere to their old, debts due from the one to the other would be liable to confiscation, as that such debts would be so liable were they contracted be? tween subjects of different nations. The principles of self preservation as much applies in the one case as the other, and the laws of nature equally sanction it in the one case as in the other. There can be no. possible question but if A. and B., both being in a state of nature, entered into contracts, by which one was indebted to the other, and afterwards became members of different governments, between which war should take place, the debt between A. and B. would be precisely in the same *76 situation, and as liable to confiscation, as any other debt subsisting between any other subjects of the warring nation. The contrary idea is absurd and unsupported by reason or authority. It is not the dissolution of governments, or the government being formed into two or more, that has cancelled these debts; but a war having subsisted between two governments and the rights which are acquired by war, together with the exercise of those rights by the state, though the state did not confiscate debts universally, and excepted them from the general act of confiscation ; yet all debts which come within the present question, and which were paid into the treasury, were to all intents and purposes as between the original creditor and debtor confiscated ; they were carried into the treasury, not to be taken out by the British creditor, but subject to the direction of the assembly; they were answerable, it is true, for debts owed by the British creditor to any subject of the state, because the state in all cases made itself answerable to its own subjects, who were creditors to the amount of the property confiscated, which belonged to the British debtor.
Suppose the legislature had given the construction to the treaty contended for by the opposite counsel, it is no rule for the judges; but it is absolutely denied that ever they have given it that construction.
By former treaties between France, Spain and Great Britain, the principle had been before recognised, that debts when peace took place should be paid, unless the government during the war had exercised its right over the debts : Also, France, Spain, &c. had no depreciated paper currency which was a legal tender, or might probably be made so. At the time of the treaty, some of the states had tender laws in force, and some of them ' have continued them since, and all of them might have done so, and but for the treaty, the British creditor (where his debt had not been paid into the treasury) would have been obliged, if he sued in our courts, to have taken payment in the same kind of money as ouf *77 citizens, and would thereby have had no cause to complain, as he would be put on a footing with our citizens,
Suppose in the case of Fabius and Antiochus, the ships had been sawed in two before the treaty, and this had been well known to both parties, I presume the Romans would not have been obliged to join them together again. I know that in the case in Georgia, no determination was given that in the least can affect the present question5 for I had it from Judge Iredell. In that case the debtor never had paid it into the treasury in Georgia, or done those acts which the law would have authorized him to have done, and was exactly in the case of a man in this State, who might have paid into the treasury, but did not do it. Judge Iredell told me the decision was on the principle that no act had been done under the law while it existed, that is, antecedent to the operation of the treaty. I know no determination of congress, nor ever heard of any, nor can conceive how they could make any determination on the subject.
That the treaty was not intended to infringe any law of any of the states in such a manner as to do away any acts which had taken place under them, or destroy any rights acquired and that it was so understood, or conceived by the British themselves, I refer the judges to Jeffersorits correspondence with the British minister.
The honourable the judges will easily perceive that many of these observations are desultory in answer to particular'arguments or objections urged by the counsel of the defendants in error.
The state had an undoubted right to exercise- the jurisdiction over the debts in any manner it thought proper; by such tender the law expressly declares the debt shall be extinguished : it therefore could not be an existing debt at the time of the treaty for the treaty to operate on.
But suppose, for argument sake, that the treaty has such an operation that the creditors whose debts were paid into the treasury are to recover their full value, the *78 consequence would be, not that the former debtor would be obliged to pay them, but that they must be paid by the state : nothing can be clearer. No principle of law is more fully established than that the debtor who pays his debt to any person by law entitled, or authorized to receive it, is thereby for ever discharged of the debt, and such receiver, from that time, remains answerable for the debts whenever in point of law he has an interest, and is entitled to demand it. Nor can it make an atom of difference whether the authority under which the payment it made is derived from the creditor himself, or flows from an act of a legislature having competent powers on the subject.
When, therefore, these debtors paid the debts into the treasury, they became for ever discharged. The state was the receiver, answerable over to any person who legally should be.interested in the debt, and entitled to receive it. If, then, therefore, the debt subsists now under the treaty, it can only subsist between the original creditors and the state to which the debtors legally made the payment. This also would be infinitely most reasonable, if these debts are again to be paid, (but which I totally disavow,) because that payment being a part of the price of peace, the community at large, who receive the boon, ought to pay the price, and not desire that a few individuals should be sacrificed for the common benefit.
Since I wrote the foregoing, I have seen the newspapers’ report of the action in which Powel Brailsford, &c. were interested. In the circuit "“court of Georgia, the question was between the British creditor and the debtor who had not paid the debt to the original credit- or, the state of Georgia, or any one else. And, as I observed before, Mr. Iredell expressly told me, the court gave judgment against the defendant because he had not made the payment under the law, while it was in force.
The state of Georgia then filed a bill to enjoin the pay *79 ment under the judgment, and to obtain a decree for the payment to the state. But the court determined, as the state of Georgia had not confiscated, but only sequestrated the debt, the state since the treaty could not he entitled to it; and as the defendant had not paid it to the state, of course he was obliged to pay it to his creditors. But there is no point better established than that, where a state only sequesters debts, there, if the debtor pays to the state under the act of sequestration, he is for ever discharged, and after peace it is the state which must account for the debts received under the act of sequestration to the original creditors.
Cap. 50. Nov. sess. 1786, is the case alluded to,as decided by the assembly. But the assembly proceeded upon no such principle as has been attributed to them. I have ever understood that act was passed in consequence of an agreement made by Mr. Chase with Mr. Hanbury, and the object was to facilitate the obtaining the bank stock.
Cooke, in reply.
The proposition of the attorney-general is denied, to wit, that each individual acquires a right as against an enemy himself, to retain the debt due from him. Such a doctrine is directly repugnant to Grot. 700. Park. 267. Vattel, b. 3. c. 5. s. 77. which declare that peace restores the right of action. Nor is the plea of alienage said in any book of authority to be more than a temporary bar.
The law of nations, as now practised, is admitted. As we have commenced an independent nation of this period, we must conform to this law, if we expect to be. on an equal footing and consideration with other nations.
Whatever right the state might have must be subject to the control of the general government; and the question is not, whether the state might have confiscated in part, or the whole; but whether they did do so, and if they did, whether the treaty of peace has undone this *80 act, and restored the right of action. The state never did confiscate, it only gave a power to plead the deposit jn the treasury a payment, but the peace has rendered that power nugatory.
If the relation between debtor and creditor ceased by the payment into the treasury, it had equally ceased, according to the attorney-general’s principles, upon the commencement of the war, and, therefore, unless the peace revived that relation, it did nothing; for if the state had made no law, the attorney alleges the debtor might retain as against his creditor. If it was the intention of the treaty to destroy the acts which were done before its existence, the Court are bound to give it that construction, and, therefore, it is a mere question of construction; for it could as well relinquish this act as any other advantage whatever. The treaty does not operate merely as a repeal of the law, but has operative words, and it was the intent to restore the right to all bona fide debts heretofore contracted. The treaty does not abandon this state, but as we are parties to the treaty, benefited by it in other respects, are we not bound to fulfil it in this particular ?
Whether the state, which sacrifices the rights of private individuals, is bound to compensate them, is a question between the state and such individuals ; plaintiff has nothing to do with it.
It is not contended that Great Britain gave the law in this treaty. The contrary is admitted and well known, and, therefore, the attorney-general’s observation on that point militates against himself.
The attorney-general’s observation that it was not the intention, by the treaty, to provide for the payment of debts over which the states had exercised their power, will be found to be of no effect if the words of the treaty are attended to; for as to this subject they speak positively, “ there shall be no impediment,” &c. but as to other subjects, they only provide that the congress shall recommend to the respective states to revise, &c. *81 The fifth article does not extend to the case of debts, because debts were expressly excepted from, confiscation.
The attorney-general says, the person must be a creditor at the time the treaty was made, to derive any benefit under the 4th article.
This is quibbling on terms, and reprehended by Vat= tel. What was the intent of the contracting parties l Could the British commissioners, or any man in England, consider the deposit in the treasury as a payment? But even this construction will not serve his purpose. The debts did exist % they were not confiscated and extinguished, but only a right was given- to plead this deposit in our courts in bar to a recovery. Suppose a debtor had gone to England after his deposit, could the debt be said to have been paid if the creditor had sued him there ; and yet a payment or extinguishment in one place would bé so everywhere.
The attorney-general insists on the uti possidetis, and that an express specification is necessary; but the plaintiff contends there is the express specification in this instance.
• The attorney-general admits that whatever rights havé been acquired, can only be lost as far as they are clearly given up ; but he can show no part of the treaty that clearly gives up these debts, but on the contrary, the British commissioners stipulate for the recovery of them in our own courts, and if nothing had been said about them, the creditor might recover the.m, if he could get possession of the property or person of the debtor in any other country, and at any future period whatever.
The attorney-general alleges that the treaty might have a construction applicable to paper money, circulating at the time of the peace ; but paper currency was not a tender at the time of the making the peace, nor for a long time before j and as to what were intended to be described by bona fide debts, there can be no doubt that all debts existed in conscience that had not been paid as- *82 cording to the original contract of the parties, unless it be in such instances where the creditors themselves, or by their agents, had consented to receive paper or any other thing in discharge. In such cases an extinguishment by the act of the party for a moment would be so fpr ever.
To give the treaty the construction that is contended for by the defendants, would be refining upon the legal import of the words, to destroy that reciprocal benefit that both parties are entitled to, and give it an operation repugnant to justice and equity.
Suppose the treaty to have said nothing on the subject, and that the act of assembly of 1780 had never been made, would not the right of action be restored by the peace ? This shows that the act of assembly is the only impediment, and that the treaty, if it does not relate to that, can relate to nothing.
The treaty made with Great Britain and the United Provinces has no clause to cover the subsisting debts between their respective subjects. But it is said former treaties were the basis of this, in which such provisions were made. But I have examined all the treaties that-ever existed between Great Britain and Holland, and there are no such clauses. Nor is there in any treaty between Great Britain and France, but they provide only for the opening of the courts, and that justice shall take place according to the laws of the respective countries. I now lodge two volumes of these treaties for the inspection of the court. To say that the treaty only provides against acts of the legislature of other states making paper money a tender, and also against any future law of this state, is giving the words only one half their operation ; for they certainly comprehend all the laws then existing, as well as any that should thereafter be made ; and is not unlike the construction put upon a treaty made between the Romans and Antiochus, in which the former stipulated to give up half the ships they had taken, and then *83 sawed them in two, by which they rendered the provision wholly useless.
At June term, 1795, the court of appeals reversed the judgment of the general court. In all- the cases where payments had been made into the treasury under the act of 1780, c. 5. the court of appeals decided that -the payments were good and valid, and reversed all the judgments contrary to this, in the general court. Some of the cases were carried up to the supreme court of the United States. See Dallas’s Reports.